**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | No.    **1:26-cr-45-LM-AJ-01** |
| | ) | |
| **KAKHA BENDELIANI** | ) | |

## INDICTMENT

The Grand Jury Charges:

At all times material to this Indictment, unless otherwise stated:

## INTRODUCTION

I.    Overview

1.    In or about and between 2022 and the date of this indictment, a transnational criminal organization (the "Organization"), based in Russia and elsewhere, orchestrated a multi-billion-dollar health care fraud and money laundering scheme (the "Scheme") to target, exploit, and steal from the Medicare program ("Medicare") and private health insurance companies contracted to provide Medicare supplemental insurance policies that help pay for the beneficiary's share of Medicare expenses ("Medicare Supplemental Insurers").  The defendant was a member of the Organization.  To date, the Organization has submitted or caused the submission of billions in fraudulent Medicare claims for durable medical equipment or "DME."

2.    The Organization purchased dozens of DME companies ("Scheme DME Companies") from prior legitimate owners that already had the ability to submit claims to

Medicare and Medicare Supplemental Insurers. The Organization executed these purchases by paying foreign nationals and others to serve as nominee owners of the Scheme DME Companies. The Organization created fictitious corporate records that falsely indicated that the nominee owners controlled the Scheme DME Companies when, in truth and fact, the Organization's foreign-based leadership maintained control.

3. After the Organization gained control over the Scheme DME Companies, it rapidly submitted billions of dollars in false and fraudulent health care claims to Medicare for DME that it did not provide. One of those Scheme DME Companies, Centennial Med Supply, LLC ("Centennial Med Supply"), submitted approximately $2,939,389,691 in claims to Medicare for DME that was not medically necessary and not provided, and was paid at least approximately $12,589,770 by Medicare and Medicare Supplemental Insurers as a result. The Organization did so by stealing the identities and personal identifying information of more than one million Americans spanning all 50 states, including New Hampshire and across New England. Hundreds of thousands of Americans, including the elderly and disabled Americans, reported their concerns to Medicare and its contractors after receiving explanation of benefit forms that reflected them purportedly receiving DME that they did not in fact receive, that was purportedly prescribed by doctors whom they had never visited, and purportedly delivered from DME companies with which they were unfamiliar.

4. Through its Scheme, the Organization also exploited the United States' financial system. Medicare and Medicare Supplemental Insurers paid the Scheme DME Companies not only by ACH or wire transfer, but also by paper check. In such instances, the Organization needed to convert these checks into fungible money to realize its substantial fraudulent profits and to transport the money abroad. To effectuate this, the Organization leveraged United States financial

2

institutions in order to deposit the checks and transfer the funds out of financial accounts, and, in doing so, exposed United States banks to substantial compliance risk. The health care fraud proceeds were particularly susceptible to laundering because they originated from legitimate sources—Medicare and established private insurance carriers—giving the funds the initial appearance of legitimacy.

5. To gain access to the United States' financial system, the Organization deployed a range of tactics to circumvent the anti-money laundering controls at multiple financial institutions. To open financial accounts, the Organization armed its nominee owners, many of whom were not lawfully present in the United States, with false sale documentation and false corporate registration documents. This documentation falsely reflected that the nominee owners maintained beneficial ownership and control of the Scheme DME Companies for which they were attempting to open accounts and disguised the true beneficial ownership and control of the entities and the accounts. This allowed the Organization to remain hidden but able to profit from the Scheme. Moreover, the use of the Scheme DME Companies' names to open financial accounts allowed the Organization to benefit from the illusion of legitimate commercial activity within the health care market.

6. Upon opening the financial accounts, the Organization funneled fraud proceeds from Medicare and other legitimate health care insurers into the accounts as seemingly "clean" money. From there, the Organization siphoned off the funds to shell companies and to various banks overseas.

7. The Organization constantly evolved, recruiting new nominee owners, stealing new identities, and acquiring new Scheme DME Companies to replace those shut down by law

3

enforcement. The Organization also routinely engaged in communications with nominee owners, employees, and others through encrypted messaging platforms.

8. As agents closed in on various conspirators, several members, including the Defendant, conducting Organization business in the United States fled the United States.

II. Background

A. Medicare and Related Concepts

9. Medicare was a federally funded health insurance program that provided health benefits to individuals who were 65 years of age or older or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency within the U.S. Department of Health and Human Services.

10. Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

11. Individuals who qualified for Medicare benefits were commonly referred to as "beneficiaries." Each beneficiary was given a unique Medicare identification number.

12. Medicare covered different types of benefits, which were separated into different program "parts." Medicare Part B covered medically necessary physician services and outpatient care, including durable medical equipment ("DME"), such as prosthetics, orthotics, continuous glucose monitors, urinary catheters, and braces.

13. DME companies, physicians, and other health care providers (collectively, "providers") that provided items or services to beneficiaries were able to apply for and obtain a National Provider Identifier ("NPI"). To participate in Medicare, providers were required to submit an enrollment application. As provided in the application, every provider was required to meet certain standards to obtain and retain billing privileges with Medicare, including: (a) provide

4

complete and accurate information on the application, with any changes to the information on the application reported within 30 days; (b) disclose persons and/or organizations with ownership interests or managing control; (c) abide by applicable Medicare laws, regulations, and program instructions; (d) acknowledge that the payment of a claim by Medicare was conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions; and (e) refrain from knowingly presenting or causing another to present a false or fraudulent claim for payment by Medicare and submitting claims with deliberate ignorance or reckless disregard of their truth or falsity. Providers were provided with online access to Medicare manuals and service bulletins describing proper billing procedures and billing rules and regulations.

14. Upon a change in ownership for an enrolled Medicare provider, the provider was required to re-submit an enrollment application setting forth details of the new ownership, including the names of all owners and managing employees, contact information, and a certification by any new individuals that they would abide by Medicare rules and regulations. The enrollment application was required to be approved by Medicare before the provider could be reimbursed for claims following a change in ownership.

15. If Medicare approved the enrollment application, Medicare assigned the provider a Medicare Provider Identification Number ("PIN" or "provider number"). Providers assigned a Medicare PIN to render services to beneficiaries could submit claims for reimbursement to Medicare that included the PIN assigned to that provider. Payments under Medicare were often made directly to the provider rather than to a Medicare beneficiary. This payment occurred when providers submitted the claim to Medicare for payment, either directly or through a billing

company.  CMS contracted with various companies to receive, adjudicate, process, and pay Medicare Part B claims, including claims for DME.

16.     Under Medicare Part B, DME was required to be reasonable and medically necessary for the treatment or diagnosis of the patient's illness or injury, ordered by a medical professional, properly documented, and provided as represented to Medicare.

17.     Medicare used the term "ordering/referring" provider to identify the physician or nurse practitioner who ordered, referred, or certified an item or service reported in that claim. Individuals who ordered, referred, or certified these items or services were required to have the appropriate training, qualifications, and licenses.

18.     A Medicare claim was required to set forth, among other things, the beneficiary's name, the date the items or services were provided, the cost of the items or services, the name and identification number of the physician or other health care provider who ordered the items or services, and the name and identification number of the provider who provided the items or services.  Providers conveyed this information to Medicare by submitting claims using billing codes and coding modifiers, which provided additional information about the medical procedure, service, or supply involved.

19.     Medicare regulations required providers to maintain complete and accurate patient medical records reflecting the medical assessments and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom items or services were provided and for whom claims for payment were submitted.  Medicare required complete and accurate patient records so that Medicare could verify that the items or services were provided as described on the claim form and so that Medicare could review the appropriateness of payments made to providers.

20. Medicare supplemental insurance, also known as Medigap, helped fill "gaps" in Medicare coverage and was sold by private health insurance companies, the Medicare Supplemental Insurers. Medigap and the Medicare Supplemental Insurers were health care benefit programs, as defined by Title 18, United States Code, Section 24(b). A Medigap plan could help pay some of the remaining health care costs not covered by Medicare, such as copayments, coinsurance, and deductibles. For DME claims, a Medigap plan generally covered approximately 20% of the claim amount. Medicare Supplemental Insurers were contractually obligated to reimburse claims that had been processed by Medicare, even if Medicare subsequently suspended payment of the claims.

21. The Medicaid program ("Medicaid") was a federal and state funded health insurance program designed to provide medical assistance to persons whose income and resources were insufficient to meet the costs of necessary care and services. The Centers for Medicare and Medicaid Services ("CMS") was responsible for overseeing Medicaid in participating states, in conjunction with agencies designated by those states participating in the Medicaid program. Medicaid entities were health care benefit programs, as defined by Title 18, United States Code, Section 24(b).

B. The Defendant and Relevant Individuals

22. Defendant **KAKHA BENDELIANI**, was a citizen of the country of Georgia who entered the United States on or about December 11, 2022. and resided in Brooklyn, NY, and Denver, CO. **BENDELIANI** served as the nominee owner of Centennial Med Supply, LLC while

residing in Denver, CO.

23.     Co-Conspirator 1, a Georgian citizen, entered the United States on or about March 5, 2023, and resided in Brooklyn, NY, Philadelphia, PA, and Denver, CO.  Co-Conspirator 1 served as a translator, driver, and assistant for **BENDELIANI**.

24.     Co-Conspirator 2 was an individual with unknown citizenship residing in an unknown location.  Co-Conspirator 2 is the registered user for an encrypted messaging account ending in user ID x4266.

25.     Co-Conspirator 3 was a Georgian citizen, who served as a translator for **BENDELIANI**.

26.     Centennial Med Supply was located in Denver, Colorado.  Centennial Med Supply was formed by Individual 1 in January 2024, and obtained a National Provider Identifier ("NPI") number through the National Plan and Provider Enumeration System ("NPPES").

C.  Centennial Med Supply

27.     Beginning no later than in or around April 2025, and continuing through in or around March 2026, in the District of New Hampshire and elsewhere, Defendant **BENDELIANI** knowingly conspired with others known and unknown to the Grand Jury to knowingly conduct, attempt to conduct, and willfully cause others to conduct and attempt to conduct financial transactions, affecting interstate and foreign commerce, involving the proceeds of specified unlawful activity, namely, health care fraud, in violation of Title 18, United States Code, Section 1347, and conspiracy to commit health care fraud, in violation of Title 18, United States Code Section 1349, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and, while conducting and attempting to conduct such financial transactions,

8

knowing the property involved in the financial transactions represented the proceeds of some form of unlawful activity, to wit: health care fraud and conspiracy to commit health care fraud, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

28. In furtherance of the conspiracy, the conspirators: (a) purchased a DME company that was already enrolled with Medicare; (b) installed **BENDELIANI** as the nominee owner of the DME company, including filing articles of amendment inserting him as the sole manager and member of Centennial Med Supply with the Colorado Secretary of State, and with respect to Centennial Med Supply's pre-existing bank account at a U.S. financial institution; (c) opened accounts for Centennial Med Supply at several other U.S. financial institutions with **BENDELIANI** as the sole signatory; (d) installed storefront employees to collect checks received from Medicare, Medicare Supplemental insurers, and Medicaid, and deposit them into financial institutions; (e) submitted billions of dollars in claims to Medicare for DME, primarily urinary catheters, that were not medically necessary and not provided as represented; (f) upon receiving reimbursements from Medicare and Medicare Supplemental Insurers, used the storefront employees to deposit proceeds into Centennial Med Supply financial accounts under **BENDELIANI**'s control; (g) through **BENDELIANI** and others, withdrew health care fraud proceeds from U.S. financial institutions in the form of cashier's checks to hide the source of the funds, deposited those cashier's checks at other financial institutions, and wired the funds overseas; and (h) transferred the fraudulent proceeds to other financial accounts, with the majority of the fraudulent proceeds eventually being transferred via wire to accounts located overseas.

29. The object of the conspiracy was carried out, and was to be carried out, in substance as follows:

a.      **BENDELIANI** was installed as the owner of Centennial Med Supply, becoming the sole officer and manager for Centennial Med Supply on or about June 20, 2025, and replaced the prior owner on an account for Centennial Med Supply at a financial institution.

b.      **BENDELIANI** and Co-Conspirator 1 opened accounts at several additional financial institutions, in and around June 2025, resulting in accounts in Centennial Med Supply's name with at least six different financial institutions, for which **BENDELIANI** was listed as the sole signatory.

c.      **BENDELIANI** failed to notify Medicare about his assuming the ownership of Centennial Med Supply.

d.      Someone using **BENDELIANI's** name and signature established an account for Centennial Med Supply with a third-party electronic medical claims submission platform. Several "user" accounts were established within that account, and those user accounts submitted claims to Medicare.

e.      During the span of **BENDELIANI's** purported ownership of Centennial Med Supply, numerous claims were submitted through the third-party electronic claims submission platform to Medicare, primarily for urinary catheters, in the amount of approximately $2,939,389,691.

f.      Due to an early payment suspension, Medicare paid Centennial approximately $1,039,049.20 as a result of the fraudulent claims submissions, and Medicare Supplemental Insurers paid at least approximately $11,550,720.80, for a total of at least approximately $12,589,770.

g.      Medicare and Medicare Supplemental Insurers paid Centennial Med Supply by direct deposit and by paper check. Employees of Centennial Med Supply would communicate

via an encrypted messaging platform with and receive directions from Co-Conspirator 2 as to which Centennial Med Supply financial institution accounts they were to deposit insurance checks into, and the employees did deposit those proceeds into the accounts as directed.

h.      Between June 2025 and December 2025, **BENDELIANI**, accompanied by Co-Conspirator 1 between June 2025 and November 20205, and later by Co-Conspirator 3 in November and December 2025, visited Denver-area branches of the financial institutions where insurance proceeds had been deposited by Centennial Med Supply employees, withdrew those proceeds in the form of cashier's checks that did not indicate they represented health insurance proceeds, and deposited those cashier's checks into Centennial Med Supply accounts at other financial institutions.  For example, on September 8, 2025, BENDELIANI (pictured below on the right) and Co-Conspirator 1 (pictured below on the left) withdrew approximately $95,780 in the form of a cashier's check from Centennial Med Supply's account with Chase Bank, while referring to a phone throughout the transaction.  That cashier's check was then deposited at Centennial Med Supply's account with Wells Fargo.



i.        Shortly after depositing the cashier's checks, **BENDELIANI** visited those same financial institutions with Co-Conspirator 1 or Co-Conspirator 3 and initiated wire transfers of the proceeds to overseas entities.  In sum, at least approximately $12,589,770, representing proceeds of health care fraud, was wired internationally from the Centennial Med Supply accounts. For example, on September 30, 2025, BENDELIANI (pictured below on the right at the counter) and Co-Conspirator 1 (pictured on the left at the counter) wired $99,610 from CENTENNIAL's Wells Fargo account to Yiwu Tota Trading Co. Ltd., an entity based in Hong Kong.



j. On or about December 12, 2025, **BENDELIANI** and Co-Conspirator 3 initiated wire transfers from a financial institution in Burbank, California. By December 21, 2025, IP logins indicate **BENDELIANI** had returned to the country of Georgia.

k. **BENDELIANI** and his co-conspirators engaged in the foregoing transactions knowing that those funds represented the proceeds of unlawful activity and that the transactions were designed in part to conceal and disguise the true nature, location, source, ownership, and control of the proceeds.

l. Between in and around December 2025 and March 2026, additional funds were received in a Centennial Med Supply bank account in **BENDELIANI's** name and were wired overseas as well.

13

<u>**COUNT ONE**</u>

(Conspiracy to Commit Money Laundering – 18 U.S.C. § 1956(h))

30. The allegations contained in paragraphs one through 29 are realleged and incorporated as if fully set forth in this paragraph.

31. In or about and between April 2025 and March 2026, both dates being approximate and inclusive, within the District of New Hampshire and elsewhere, the defendant **KAKHA BENDELIANI**, together with others, did knowingly and intentionally conspire to transport, transmit and transfer monetary instruments and funds, from one or more places in the United States to and through one or more places outside the United States knowing that the monetary instruments and funds involved in the transportation, transmission and transfer represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmission and transfer was designed in whole and in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of one or more specified unlawful activities, to wit: health care fraud, in violation of Title 18, United States Code, Section 1347, and health care fraud conspiracy, in violation of Title 18, United States Code, Section 1349, contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

**NOTICE OF FORFEITURE**

[18 U.S.C. § 982(a)(1) and 21 U.S.C. § 853]

32. Paragraphs 1 through 31 of this Indictment are incorporated herein by reference as factual allegations.

33. Upon conviction of the offenses alleged in Count 1 of this Indictment, the defendant, **KAKHA BENDELIANI**, shall forfeit to the United States pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in said offense, or any property traceable to such property, including but not limited to the following:

- All funds located in Bank of America account in the name of Centennial Med Supply, LLC, ending in -7339

- All funds located in First Bank account in the name of Centennial Med Supply, LLC, ending in -9032

- All funds located in UMB Bank account in the name of Centennial Med Supply, LLC, ending in -4112

- All funds located in US Bank account in the name of Centennial Med Supply, LLC, ending in -1728

34. If any of the above-described property, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be subdivided without difficulty,

15

it is the intent of the United States to seek a forfeiture money judgment and, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

**A TRUE BILL**

/s/ Foreperson
Dated: June 17, 2026                                      Grand Jury Foreperson

ERIN CREEGAN
United States Attorney
District of New Hampshire

LORINDA LARYEA
Chief
United States Department of Justice
Criminal Division, Fraud Section

By: /s/ John W. Howard
Thomas D. Campbell
John W. Howard
Trial Attorneys
Criminal Division, Fraud Section

/s/ Matthew P. Vicinanzo
Matthew P. Vicinanzo
Assistant United States Attorney